IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.: 2021-016314-CA-01

Diana B. Cluff, individually and as
the Personal Representative of The
Estate of Gustavo Beaz; and Jacqueline
F. Beaz, individually;

Plaintiffs

v.

Miami-Dade County; Miami-Dade Fire
Rescue Department; Captain Artis West;
Allison Ault; and Jerome Weldon;

Defendants.

_____

## PLAINTIFFS' AMENDED COMPLAINT

COME NOW, the Plaintiffs, Diana B. Cluff, both individually and on behalf of the

Estate of Gustavo Beaz, and Jacqueline F. Beaz, individually, and bring forth this 42

U.S.C. § 1983 Civil Rights action seeking relief for the loss of the rights to liberty, due

process, bodily integrity, and personal security of their father Gustavo Beaz by the

Defendants, including the Miami-Dade Fire Rescue Department who through its final

policymakers, adopted or maintained unconstitutional policies and/or informal practices

and customs including the deliberate indifference as to whether its firefighter/paramedics

were complying with the law and established procedures. Such policies, customs, and

deliberate indifference deprived Gustavo Beaz of his rights guaranteed to him by the

Fourteenth Amendment of the United States Constitution and ultimately caused his

untimely death at age 66; in support of this claim and in support of their and additional

and alternative claims as alleged below, the Plaintiffs state as follows:

### *JURISDICTIONAL STATEMENT, VENUE, AND IDENTIFICATION OF PARTIES*

1.      This is an action for damages well in excess of Seventy-Five Thousand Dollars ($75,000.00), which is in excess of the Court's minimum jurisdictional limits, exclusive of interest and costs.

2.      This action is brought pursuant to Sections §§ 786.16 - 768.26, Florida Statutes, more commonly referred to as the "Florida Wrongful Death Act."

3.      This action is also brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988. It is well settled that State courts may exercise jurisdiction over claims brought under 42 U.S.C. § 1983. *See e.g., Haywood v. Drown*, 556 U.S. 729, 731 (2009).

4.      Venue is proper as the events or omissions giving rise to the claims occurred within the county where this Court is situated.

5.      Gustavo Beaz was a resident of Miami-Dade County, Florida on April 2, 2019, the date of his death. He was 66 years old.

6.      Plaintiff, Diana B. Cluff, is the surviving adult daughter of Mr. Beaz and the duly appointed personal representative of the Estate of Gustavo Beaz. She is, and was at all times relevant, a resident of Miami-Dade County, Florida.

7.      Plaintiff, Jacqueline F. Beaz, is *sui juris* and the second surviving child of Mr. Beaz; she is considered a minor child pursuant to Fla. Stat. § 768.18. At the time of the incident, she was temporarily residing in Leon County, Florida, and she is currently a resident of Hillsborough County, Florida.

8.      Defendant, Miami-Dade Fire Rescue Department, is and has at all times been a division of the governmental entity, Miami-Dade County, existing under and by

virtue of the laws of the State of Florida, with a principal place of business located at 9300 NW 41st Street, Miami, Florida 33178-2414. The Defendant, Miami-Dade County, is a municipal entity existing under and by virtue of the laws of the State of Florida, with a principal place of business located at 111 NW 1st Street, Suite 2130, Miami, Florida 33128. Both Miami-Dade Fire Rescue Department and Miami-Dade County will be hereinafter collectively referred to as the "DEPARTMENT."

9.      Defendant, Captain Artis West (hereinafter referred to as "CAPT. WEST") is and/or was a licensed EMT-Paramedic, a resident of Miami-Dade County, Florida and at all times relevant was an employee of the Defendant, DEPARTMENT.

10.     Defendant, EMT-Paramedic Allison Ault (hereinafter referred to as "AULT") is and/or was a licensed EMT-Paramedic, a resident of Miami-Dade County, Florida and at all times relevant was an employee of the Defendant, DEPARTMENT.

11.     Defendant, EMT Jerome Weldon (hereinafter referred to as "WELDON") is and/or was a licensed EMT, a resident of Miami-Dade County, Florida and at all times relevant was an employee of the Defendant, DEPARTMENT.

12.     It was and is the responsibility the DEPARTMENT, its agencies, employees and agents to properly hire, train, supervise, staff and enforce proper policies and procedures to ensure that its fire officials and paramedics were not, and are not, intentionally, deliberately, recklessly, negligently, or consciously indifferent to the lives and safety of its citizens, including Mr. Beaz.

13.     At all times material to this Complaint, CAPT. WEST, AULT, and WELDON (hereinafter collectively referred to as the "PARAMEDICS") acted within the course and scope of their duties for which they were hired, trained, and supervised by the

DEPARTMENT. The DEPARTMENT is responsible for the acts of said employees, including the PARAMEDICS, whose acts and omissions are imputed to it under the theories of *respondeat superior* and actual agency.

14.     At all times material to this Complaint, the Defendants were performing a governmental function, under the control and supervision of government officials and with government funds. All actions performed by the Defendants were actions performed under the color of state law and constitute state action.

15.     The Plaintiffs have provided notice to the appropriate agency and the Department of Financial Services, in accordance with the requirements of Florida Statutes §768.28. Despite the egregiousness of the actions taken by the DEPARTMENT and its employees, they have failed to respond.

16.     This action is properly brought within two years of the date the cause of action accrued, which has been tolled for the period of time taken by the appropriate agency and/or Department of Financial Services to deny the claim, pursuant to § 768.28.

17.     Any and all conditions precedent to the filing of this lawsuit have been complied with by the Plaintiff.

### ***BACKGROUND***

18.     The DEPARTMENT's Fire Rescue trucks are purportedly staffed with fire fighters who are also trained and licensed Emergency Medical Technicians ("EMTs") or EMT-Paramedic. According to the DEPARTMENT, these professionals are property trained, supervised, and equipped with the knowledge and skill to perform CPR, defibrillation, patient intubation, to administer lifesaving intravenous (IV) medications, and transport patients to medical facilities while rendering appropriate medical evaluation and

care.

19.     For a first response Emergency Medical Services unit, the national standard is a 60 second "turnout time[1]" and 240 second "travel time" (together, 300 seconds or 5 minutes first "response time"). This benchmark considers that the responding unit will need to travel, potentially in traffic, for several miles.

20.     The DEPARTMENT claims to have a 60 second "turnout time", but in actuality, their employees are continuously violating these response policies. This is particularly prevalent in known "retirement stations.[2]"

21.     In fact, it is customary for DEPARTMENT employees to falsify their response times, as they did in this case – something that would be readily apparent to the DEPARTMENT through a simple review of the Patient Care Reports (PCR) generated for each call.

22.     However, as part of its continued willful blindness as to whether policies and procedures are being followed, the DEPARTMENT does not have a proper system in place to review the actions taken by its employees during an emergency call in order to evaluate and confirm whether policies are being followed and whether any corrective measures, disciplinary action, or additional training is necessary. Without a proper system, the DEPARTMENT is unable to identify its inadequacies and unable to take any corrective measures against its employees.

23.     The DEPARTMENT's employees, including the PARAMEDICS, continue to

---

[1]  "Turn-out time" refers to the time which elapses between dispatch notifying a crew of their assignment to a call and the time the crew advises dispatch that it is "en route."

[2]  The term "retirement station" is widely used throughout the DEPARTMENT to refer to those stations that run fewer emergency calls and are therefore considered "slow". DEPARTMENT employees who are in retirement mode bid to work at these stations in order to run fewer calls, particularly at night when sleep is interrupted.

violate these policies, and others, because it is well known in the DEPARTMENT that there will be no true consequence, even when violation of these policies results in the death of a patient, as occurred with Mr. Beaz.

24.     The DEPARTMENT has exhibited a deliberate indifference with regard to its employees' compliance with required response times and how this may affect the patients who are waiting to be assisted.

25.     The DEPARTMENT has exhibited a deliberate indifference with regard to its employees' compliance with medical protocols and policies and procedures that are implemented in order to save the lives of citizens. The DEPARTMENT is aware that it is useless to implement policies and protocols without proper supervision, enforcement, and discipline, yet it continues to turn a blind eye and show deliberate indifference to the constitutional violations and negligent acts of its employees, including the PARAMEDICS.

### *FACTS GIVING RISE TO THIS ACTION*

26.     On April 2, 2019, Mr. Beaz was having difficulty breathing, which prompted him to press the button on his medical alert device in order to receive emergency rescue response from the DEPARTMENT and its EMT-Paramedics. According to the DEPARTMENT's records, they received this call at 2:06:28 a.m.

27.     The PARAMEDICS were employed by the DEPARTMENT and working at Station 27 on Rescue 27, which was dispatched at 2:06:45 a.m.

28.     According to the enclosed certified true copy of the PCR, Mr. Beaz's call for help was dispatched by the DEPARTMENT with an incident type of "341F – Sick or injured person" and under the "remarks" portion of the dispatch record it shows the call was initiated by "FD/COMBS,SHERENE;MED ALARM;GUSTAVO BEAZ 67 YOM DIFF

BREATHING".

29. These remarks, which were made available to the responding PARAMEDICS, make clear that the call was initiated by a medical alarm company because Mr. Beaz was having difficulty breathing. The PARAMEDICS were fully aware that the initiation of a medical alarm call comes from the activation of a physical device (whether it be the device worn by the patient or the home calling station located within the residence), and that the specific information that Mr. Beaz was having "difficulty breathing" would come from his own reporting. Accordingly, the PARAMEDICS were fully aware that Mr. Beaz was alive and communicating at the time of his call for help, just moments before Rescue 27 was assigned to assist him.

30. According to the PCR, after being dispatched at 02:06:45 the responding PARAMEDICS reported being "en route" at 02:08:28, which is 1 minute and 43 seconds after dispatch. Consistent with industry standard, the DEPARTMENT's policy required the PARAMEDICS to be "en route" within 60 seconds.

31. In the PCR, the PARAMEDICS reported that they arrived on scene at 02:13:25, which is 6 minutes and 40 seconds after dispatch and 4 minutes and 57 seconds after they reported they were "en route". The PCR notes that their "Response Mode to Scene" was "Emergent (Immediate Response)" meaning they were aware of the emergency and driving with sirens and emergency running lights.

32. Station 27 is only one (1) mile away from Mr. Beaz's home, on a straight three-lane road. Traveling this road at the regular speed limit of 45 mph would take only 1 minute and 36 seconds. Considering that these PARAMEDICS were traveling after 2:00 a.m. on a Tuesday with essentially no other cars on the road, and to a known emergency

where they should have driven expeditiously and with lights and sirens on, it should have taken the PARAMEDICS *less than* 1 minute and 36 seconds to travel from their station house to Mr. Beaz' home.

33.    Assuming the correctness of the PCR, the PARAMEDICS failed or refused to indicate in the report the reason for their delay in leaving the Station and further failed to report why it took so long to travel one mile to the Beaz residence.

34.    The PARAMEDICS took essentially 5 minutes to arrive at the Beaz residence when, in fact, it should have taken less than 1 minute. Ironically, when returning to their station after Mr. Beaz's call, it took the PARAMEDICS less than 2 minutes to travel this same distance (while driving the speed limit and in a non-emergent mode).

35.    This is not the first time that DEPARTMENT employees either falsify response times or simply fail to comply with policies and procedures requiring emergent response and care to the DEPARTMENT's citizens. Instead, this is a rampant and prevalent practice throughout the DEPARTMENT, created by the DEPARTMENT which fosters and engenders the understanding by its employees (including the PARAMEDICS) that such emergent response policies and procedures can be violated with impunity.

36.    A cursory review of the PCR would have revealed these violations of DEPARTMENT policies and the obvious discrepancies and/or false reporting of the en route time reported by the PARAMEDICS. Because the DEPARTMENT has no such review process, procedures, or policies for such reviews (and/or any such policies are wholly inadequate and violate industry standards), the DEPARTMENT deliberately fails to identify malfeasance and nonfeasance, including the violation of DEPARTMENT policies by its employees, such as the PARAMEDICS.

37.     These facts and the PCR are indicative that the PARAMEDICS falsified their en route time, otherwise the only logical explanation is that they were traveling 14.5 miles per hour or less to a known emergency, either of which is an unnecessary and unreasonable delay under the circumstances. This conduct constitutes a conscious and deliberate disregard for the life and health of citizens including Mr. Beaz.

38.     Unfortunately, the falsification of the en route and arrival time is not the most egregious act committed by the PARAMEDICS, who were emboldened by the practices and customs that were created by the DEPARTMENT and reaffirmed by its willful blindness and deliberate indifference.

39.     According to the PCR, after arriving at 02:13:25 the crew made patient contact at 02:15:00 and determined that Mr. Beaz was "DOA" (dead on arrival).

40.     According to Miami-Dade Fire Rescue Medical Operations Manual Protocol 27 – Death in the field, the DEPARTMENT **requires** that the following criteria be met in order to make a DOA determination:

> The following guidelines are to be used to determine whether cardiopulmonary resuscitation may be withheld or terminated:
>
> 1. After a Primary Assessment **Protocol 01** it is determined that there is an absence of pulse and spontaneous respirations coupled with an EKG reading of asystole, agonal rhythm less than 10 bpm, **and** any of the following:
>
>    a) Tissue decomposition.
>
>    b) **Rigor Mortis** with warm air temperature- hardening of the muscles of the body, making the joints rigid and the presence of fixed and non-reactive pupils.
>
>    c) **Livor Mortis-** venous pooling of blood in dependent body parts causing purple discoloration of the skin, which does not blanch with pressure and the presence of fixed and non-reactive pupils. (Note: similar but milder changes can be seen in severe, but reversible shock. Care must be exercised to distinguish between the two).

41.     If these criteria are not met upon assessment, the patient **must** be treated and transported to the hospital for additional care. To do anything but render care and transport Mr. Beaz without these presentations constitutes a violation of Florida Statute §401.45(1)(a) and specifically subjects the Defendants to civil liability as a matter of law.

42.     The PCR narrative, which was authored and signed by CAPT. WEST, reports: "Pt call generated from medical alert as difficulty breathing. On arrival found door unlocked, pt sitting in chair with foam on nose and mouth, unresponsive, cold to touch, apneic, and pulseless, EKG asystole. Pt DOA."

43.     In the narrative, the PARAMEDICS failed to document any one of the three (3) additional presentations that are required to make a DOA determination. There is no reference of tissue decomposition, rigor mortis, or livor mortis in the report, because none of these would be present in a patient who was confirmed to have been alive, conscious, and alert enough to contact the DEPARTMENT for assistance, just minutes prior to the PARAMEDICS' arrival.

44.     Furthermore, although the PARAMEDICS reported that the "EKG [reading was] asystole," Mr. Beaz's EKG reading which is attached to the PCR not only shows four easily identified well organized, and rhythmic complexes, the monitor itself identified the heat rate as 25 beats per minute (which was clearly visible on the hand-held device the PARAMEDICS were holding). The death in the field protocol specifically states that an agonal rhythm must be less than 10 beats per minute.

45.     A quick review of the EKG strip provided to the PARAMEDICS on scene would make it clear to any properly trained and reasonable paramedic that the rhythm Mr. Beaz was in was not asystole, as falsely reported, but was instead displaying either

bradycardia or pulseless electrical activity (PEA).

46.     According to industry standards, bradycardia and PEA are **in all cases** treatable rhythms that would require crews to initiate medical treatment or cardiopulmonary resuscitation efforts and expedite transport to the closest appropriate emergency department. Only an untrained and unsupervised EMT/paramedic could mistake a rhythm of bradycardia or PEA for asystole.

47.     In layman's terms, asystole means that the EKG reading would be a "flat line," such as what is routinely demonstrated in television shows, while bradycardia or PEA would show organized curves on the strip, evidencing a rhythm. Any untrained lay person would be able to differentiate asystole (i.e., "flat line") versus any other electrical rhythm.

48.     The PARAMEDICS are only permitted to make a determination of DOA with an asystole reading, in addition to the above-noted findings.

49.     After the EKG was placed on Mr. Beaz, he had a clearly organized cardiac rhythm for at least 1 minute 03 seconds, while the PARAMEDICS stood over him and watched doing absolutely nothing to treat him until he finally converted to a rhythm of asystole. The PARAMEDICS provided no care whatsoever in this time and then allowed the EKG to run for an additional 2 minutes and 45 seconds in asystole, again while providing no care whatsoever.

50.     In effect, the PARAMEDICS did nothing and waited for Mr. Beaz to die, while they stood over him and watched, rather than performing their duties as required by law and industry standards.

51.     The PARAMEDICS fail or refuse to explain why they did not treat or

transport Mr. Beaz, when they were with him for several minutes while he had a heart rate and an organized cardiac rhythm, well before he converted to asystole.

52.     CAPT. WEST's assertion in the PCR that Mr. Beaz was "cold to touch" is a medical impossibility. The PARAMEDICS were fully aware that Mr. Beaz was the one who called for assistance and that he provided the patient history of "difficulty breathing." This tells a reasonable paramedic that Mr. Beaz could not be "cold to the touch" as he was communicating and taking action shortly before they were dispatched. Furthermore, the narrative also notes that the door was unlocked, which we know was done by Mr. Beaz after he called for assistance and was reassured that help was on the way.

53.     A properly trained paramedic knows that a body does not become cold to the touch for a few *hours*. In fact, when Plaintiff Ms. Cluff was finally permitted by police to enter her father's home several hours later, he was still warm to the touch.

54.     Even before an EKG reading, Mr. Beaz should have never been considered as "dead on arrival" by the PARAMEDICS and resuscitation efforts should have commenced the moment the PARAMEDICS entered Mr. Beaz's home. Instead, the PARAMEDICS failed to take any lifesaving equipment from Rescue 27 into Mr. Beaz's home and did not attempt any form of resuscitation or transport. Rather, they stood by and waited for Mr. Beaz to die.

55.     In fact, while one of the PARAMEDICS was in the process of pulling life-saving equipment out of the vehicle along with a stretcher in order to transport Mr. Beaz, these efforts were immediately halted because the PARAMEDICS instantly decided that Mr. Beaz was already dead (contrary to reality). Thereafter, the PARAMEDICS decided to only enter the home with an EKG machine that could be used to justify their blatantly

erroneous decision not to render any care or treatment to Mr. Beaz.

56.     Because of improper training by the DEPARTMENT and a complete lack of care by the Paramedics, it is clear that the PARAMEDICS decided that they would report Mr. Beaz was deceased, from the moment of arrival and without taking any efforts, otherwise they would have entered the home with the necessary equipment to treat and with the stretcher in order to transport him.

57.     This is also clear given that the PARAMEDICS chose to only place Mr. Beaz on a 3-lead EKG, instead of using the "quick combo pads" which would allow them to not only determine a cardiac rhythm but also administer the appropriate electrotherapy based upon that reading. This also violates industry standards and proper protocols.

58.     After running the 3-lead EKG, the machine instantly printed a reading for the PARAMEDICS. This reading once again alerted the PARAMEDICS that Mr. Beaz was, in fact, **not** dead but rather in need of immediate medical assistance and care. The reading showed that Mr. Beaz had a heartrate of 25 beats per minute, which should have triggered the PARAMEDICS to immediately begin compressions and transport Mr. Beaz to a local hospital.

59.     Mr. Beaz was never "dead on arrival," instead, he was in the PARAMEDICS custody for at least five (5) minutes while the PARAMEDICS waited for the EKG reading to switch from bradycardia or PEA to a reading of asystole.

60.     The failure of the PARAMEDICS to provide any meaningful medical care to Mr. Beaz manifests a reckless disregard and/or deliberate indifference to his serous medical needs in violation of his constitutional rights. But for the deliberate indifference and reckless disregard for his life and health, the death of Mr. Beaz could have been

avoided in the ordinary course of events, if he had received prompt and proper medical attention.

61.     This is not the first time that the DEPARTMENT's employees, including but not limited to the PARAMEDICS, improperly fail to render care and/or assess a citizen as "dead on arrival," when in actuality they are required to provide care and transport.

62.     Again, a cursory review of the PCR (both in this case and in prior similar instances) would have revealed these – and prior – egregious violations of DEPARTMENT policies and the obvious discrepancies and/or false reporting by the PARAMEDICS. Because the DEPARTMENT has no such review process, procedures, or policies for such reviews, the DEPARTMENT deliberately fails to identify such malfeasance and nonfeasance and violation of DEPARTMENT policies by its employees, despite knowledge that these violations could lead to the injury and death of its citizens.

63.     In this particular case, an investigation was performed only after a complaint was made on behalf of Mr. Beaz's surviving children. Despite the egregious circumstances, the investigation was not conducted until several months after the complaint was made. In its conclusion, the investigating EMS Captain found as follows:

> Based on the initial dispatched information, the time of patient contact along with the confirmed patient rhythm that was documented from the lifepak, **I was not able to find any legitimate reasons in the protocols as to why Rescue 27 made the decision not to resuscitate the patient.**

64.     Had the DEPARTMENT properly trained, supervised, and admonished its employees, Mr. Beaz's death would not have occurred. In addition, if the DEPARTMENT had in place proper procedure and protocols to review PCRs, such conduct could have been readily identified, and corrective and/or punitive measures could have been invoked

in order to correct such conduct within the DEPARTMENT, thereby preventing Mr. Beaz's death.

65.     As a direct result of the DEPARTMENT's inattentiveness and failure to properly supervise its employees, the DEPARTMENT created an environment where improper practices and customs are rampant, unreported, undetected, and permitted to continue without consequence. It is the lack and absence of proper oversight and review by the DEPARTMENT which are the driving force behind the PARAMEDICS' misconduct in this case. PARAMEDICS know that they will not face any true repercussions when they falsify response times, fail to administer aid, or commit any number of serious acts which endanger the lives of citizens and which show a disregard for the consequences.

66.     In fact, when the EMS Officer In Charge (OIC) was contacted on behalf of Mr. Beaz's surviving children, in order to report the incident, he explicitly stated, "don't worry, no one will get in trouble over this." This was after the same EMS OIC confirmed (in the same call) that there was no explanation for why the PARAMEDICS failed to render care or transport Mr. Beaz.

67.     The purported consequences (or lack thereof) resulting from the investigation further corroborate this mentality and environment that the DEPARTMENT has created, fostered, and condoned. Specifically, there were no repercussions for the PARAMEDICS' actions which are commensurate with the egregiousness of their acts and omissions that resulted in the death of a patient – particularly where the EMS Captain unequivocally concluded that there were no "legitimate reasons" to explain the PARAMEDICS' acts and omissions.

68.     This is the perfect example of the prevalent mentality of the DEPARTMENT;

specifically, no matter how egregious the constitutional violation committed or the injury that occurs (i.e., even the untimely death of a citizen), the DEPARTMENT is unwilling to implement and enforce policies and procedures to combat known improper practices and policy violations by its employees. The DEPARTMENT's failure and refusal to properly supervise and oversee its employees displays a reckless callousness, complacency, and disregard for the health and welfare of the citizens of Miami-Dade County, Florida, including Mr. Beaz. This deliberate indifference and apathy displayed by the DEPARTMENT and its failure to implement policies sufficient to combat known problems in its operations, as alleged herein, directly caused Mr. Beaz's untimely death, and the violation of his constitutional rights to liberty, due process, bodily integrity and personal security as provided under the 14th Amendment in the United States Constitution.

69.     Based upon information and belief, this is not the first time that the DEPARTMENT's employees incorrectly determine that a citizen is "dead on arrival" nor is it the first time that the DEPARTMENT's employees falsify response times.

70.     The DEPARTMENT has the capacity and ability to monitor response times, review reports, and supervise its EMT and EMT-Paramedics, yet it fails to do so. It is industry standard to monitor all response times, review all reports, and provide said supervision, in order to ensure that the DEPARTMENT's employees are following policies and procedures. However, based upon information and belief, the DEPARTMENT does not have any system in place to monitor and review its employees' response to emergencies, or the system is wholly inadequate and fails to meet industry standards.

### <u>COUNT I - VIOLATION OF CIVIL RIGHTS - 42 U.S.C. 1983<br>AGAINST THE DEPARTMENT</u>

71.     Plaintiffs reassert and reallege paragraphs 1 through 70, as if fully set forth

in this count.

72.     At all times material to this Complaint, and prior to prior to April 2, 2019, the DEPARTMENT permitted, fostered, and maintained unofficial policies, practices and/or customs exhibiting deliberate indifference to the constitutional rights of persons which directly led to the deprivation of Mr. Beaz's constitutional rights. In addition, and/or in the alternative, the DEPARTMENT exhibited willful blindness to its employees' failures (including the PARAMEDICS) to follow DEPARTMENT policies and procedures in violation of industry standards which also resulted in the deprivation of Mr. Beaz's constitutional rights.

73.     The foregoing is exemplified through, but is not limited to, the following:

a. It was the policy, practice or custom of the DEPARTMENT, to permit, condone, ratify, and/or turn a blind eye towards the conduct of its PARAMEDICS and employees, as alleged herein, that violated the Constitution of the United States and the State of Florida, Florida Statutes and the Miami-Dade Fire Rescue's Medical Operations Manual and other policies and procedures in place, all in violation of industry standards;

b. It was the policy, practice or custom of the DEPARTMENT to allow incident reports, that were known or should have been known to contain false and misleading information, to be used as the basis for covering up the inadequacies of its employees, including the PARAMEDICS, and the DEPARTMENT's failure to train and supervise;

c. It was the policy, practice or custom of the DEPARTMENT to inadequately and improperly investigate citizen complaints against its employees,

including the PARAMEDICS;

d. The DEPARTMENT was willfully blind to the inadequacies of its employees, including the PARAMEDICS, in that it did not have any policy or procedure by which each emergency response report was reviewed in order to ascertain whether its employees were following emergency protocols and the DEPARTMENT's policies, and/or that any such procedure was wholly inadequate;

e. It was the policy, practice or custom of DEPARTMENT to tolerate a chronic pattern of misconduct by a number of its employees, including the PARAMEDICS, with no significant effort to properly supervise, monitor, discipline or terminate employees with established patterns of misconduct, complaints, and/or other inexplicable decisions in the field;

f. The DEPARTMENT had a policy, practice or custom of failing to properly supervise, or monitor investigations of, its employees with established patterns of misconduct, complaints, and/or other inexplicable decisions in the field;

g. The DEPARTMENT was willfully blind to its employees' failure to follow industry standards and its own policies relating to response times, despite knowing that every second is critical to the lives and health of its citizens;

h. The DEPARTMENT failed to monitor, supervise, and admonish what are widely referred to as "retirement stations," such as Station 27 at issue in this case, in order to ensure that policies and procedures are being followed; and/or

i.   Any other act, omission, failure, deliberate indifference or willful blindness by the DEPARTMENT as discovery may reveal.

74.   Said unofficial policies, practices or customs of the DEPARTMENT, represent policies, practices or customs of the DEPARTMENT, notwithstanding the fact that said policies, practices or customs may not have received formal approval through official decision-making channels.

75.   Alternatively, the DEPARTMENT, by and through its employees, agents, and/or servants, and while acting under the color of State law, failed to enact or promulgate sufficient policies or procedures to ensure against the deliberate indifference to Mr. Beaz's serious medical needs knowing that a failure to do so could result in his death.

76.   Alternatively, the DEPARTMENT, by and through its employees, agents, and/or servants, while acting under the color of State law, employed a custom of violating its own policies and procedures which resulted in deliberate indifference to Mr. Beaz's serious medical needs, and/or was willfully blind to its employees' violation of its own policies and procedures.

77.   Mr. Beaz's death was a reasonably foreseeable result and consequence of the DEPARTMENT's custom of ignoring existing policies and procedures and/or failing to enact sufficient policies and procedures resulting in the deliberate indifference to Mr. Beaz's serious medical needs and the likelihood of death if left unassisted with his difficulty in breathing.

78.   The DEPARTMENT's high-ranking officials are fully aware of the customs and practices of its employees, including the PARAMEDICS, as outlined above, yet took

no remedial or disciplinary action.

79.     The PARAMEDICS actions and failure to render care was caused by the DEPARTMENT's policy, practice and custom as set forth herein and failure to adequately train and supervise its employees, including the PARAMEDICS, to respond emergency calls.

80.     At all times relevant, the conduct of the PARAMEDICS in failing to render aid was the result of a policy statement, regulation or decision officially adopted and promulgated by the DEPARTMENT, or its officials, or the result of the DEPARTMENTS' practice and custom, and was a substantial factor and a proximate cause of Mr. Beaz's death.

81.     These policies, practices, and/or customs was/were the "moving force" behind the deprivation of Mr. Beaz's constitutional rights by the PARAMEDICS; and the violation of 42 U.S.C. § 1983, which resulted in his death and the injuries and damages to his family and beneficiaries.

82.     The DEPARTMENT, through the actions of its employees, agents, and/or servants, described above, caused Mr. Beaz to be subjected to the deprivation of rights, privileges and immunities secured by the Constitution and the laws of the United States, and the State of Florida, including the fundamental rights to due process, liberty, and life, and violation of the rules and regulations of the State of Florida, including but not limited to, Fla. Stat 401.45(1)(a).

83.     Alternatively, or in conjunction with the above, the DEPARTMENT is liable for Mr. Beaz's death because it created or enhanced the danger to his life by fostering and engendering an environment where its employees could violate established policies

with impunity, as outlined in all allegations herein. The harm, specifically the injury and death of Mr. Beaz, was foreseeable and fairly direct, and the Defendants clearly acted with a degree of culpability that shocks the conscience.

84.     A relationship between the DEPARTMENT and Mr. Beaz existed in that Mr. Beaz was a foreseeable victim of the DEPARTMENT's actions and omissions, or a member of a discrete class of persons subjected to the potential harm brought about by the DEPARTMENT's actions and omissions; and the DEPARTMENT and the PARAMEDICS affirmatively used his/her/its authority in a way that created a danger to Mr. Beaz or that rendered him more vulnerable to danger than had the Defendants not acted at all. In support of this, Plaintiffs reassert all allegations referenced within this count; additionally, had the DEPARTMENT not provided assurances that its PARAMEDICS would provide emergent assistance, Mr. Beaz would have called his paramedic son-in-law and daughter who lived just half a mile (0.5 mi) away.

85.     Furthermore, it was the PARAMEDICS' affirmative act of falsely pronouncing Mr. Beaz dead and denying aid, which created the danger. The DEPARTMENT, through its PARAMEDICS, acted with reckless disregard by denying aid to someone they knew to be alive.

86.     As a direct and proximate foreseeable result of the foregoing, Mr. Beaz suffered severe physical and emotional injuries and mental and physical pain and suffering, which ultimately resulted in his untimely death on April 2, 2019, and loss of enjoyment of life. PLAINTIFFS, as his surviving children, have also suffered damages which they are entitled to recover, including but not limited to those enumerated under § 768.21, Florida Statutes, such as: the value of lost support and services from the date of

the decedent's injury to her or his death, with interest, and future loss of support and services from the date of death and reduced to present value; lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury; and medical and funeral expenses owed and paid.

WHEREFORE, the Plaintiffs demand judgement against the DEPARTMENT for compensatory damages, post judgment interest, costs, and attorney's fees pursuant to 42 U.S.C. 1988, and such other relief as this Honorable Court may deem equitable and just under the circumstances.

### COUNT II - VIOLATION OF CIVIL RIGHTS - 42 U.S.C. 1983 AGAINST DEFENDANTS' CAPT. WEST, AULT, AND WELDON

87.     Plaintiffs reassert and reallege paragraphs 1 through 70, as if fully set forth in this count.

88.     Defendants, CAPT. WEST, AULT, and WELDON ("PARAMEDICS"), while acting under the color of State law, failed to comply with the DEPARTMENT's policies or procedures to ensure against the deliberate indifference to Mr. Beaz's serious medical needs knowing that a failure to do so could result in his death.

89.     Alternatively, the Defendant PARAMEDICS, while acting under the color of State law, employed a custom of violating the DEPARTMENT's policies and procedures which resulted in deliberate indifference to Mr. Beaz's serious medical needs.

90.     Mr. Beaz's death was a reasonably foreseeable result and consequence of the PARAMEDICS' custom of ignoring existing policies and procedures and/or failing to enact sufficient or comply with policies and procedures.

91.     The PARAMEDICS acted with reckless disregard for the consequences so as to affect the life and health of Mr. Beaz.

92.     As a result of the actions or inactions described above, the PARAMEDICS caused Mr. Beaz to be subjected to the deprivation of rights, privileges and immunities secured by the Constitution and the laws of the United States, and the State of Florida, including the fundamental rights to due process, liberty, bodily integrity, personal security, and violation of the rules and regulations of the State of Florida, including but not limited to, Fla. Stat 401.45(1)(a).

93.     Alternatively, or in conjunction with the above, the PARAMEDICS are liable for Mr. Beaz's death because they created or enhanced the danger to his life. The harm, specifically the injury and death of Mr. Beaz, was foreseeable and fairly direct, and the Defendants clearly acted with a degree of culpability that shocks the conscience.

94.     A relationship between the PARAMEDICS and Mr. Beaz existed in that Mr. Beaz was a foreseeable victim of the PARAMEDICS' actions and omissions, or a member of a discrete class of persons subjected to the potential harm brought about by the PARAMEDICS' actions and omissions; the PARAMEDICS affirmatively used their authority in a way that created a danger to Mr. Beaz or that rendered him more vulnerable to danger than had the PARAMEDICS not acted at all. In support of this, Plaintiffs reassert all allegations referenced within this count; additionally, it was the PARAMEDICS' affirmative act of falsely pronouncing Mr. Beaz dead and denying, which created the danger.

95.     The PARAMEDICS acted with reckless disregard by denying aid to someone they knew to be alive.

96.     As a direct and proximate foreseeable result of the foregoing, Mr. Beaz suffered severe physical and emotional injuries and mental and physical pain and

suffering, which ultimately resulted in his untimely death on April 2, 2019, and loss of enjoyment of life. PLAINTIFFS, as his surviving children, have also suffered damages which they are entitled to recover, including but not limited to those enumerated under § 768.21, Florida Statutes, such as: the value of lost support and services from the date of the decedent's injury to her or his death, with interest, and future loss of support and services from the date of death and reduced to present value; lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury; and medical and funeral expenses owed and paid.

WHEREFORE, Plaintiffs demand judgement against the PARAMEDICS, CAPT. WEST, AULT, AND WELDON, for compensatory damages, post judgment interest, costs, attorney's fees pursuant to 42 U.S.C. 1988, and such other relief as this Honorable Court may deem equitable and just under the circumstances.

### COUNT III - VIOLATION OF FLA. STAT. §401.45(1)(a)
### AGAINST ALL DEFENDANTS

97.     Plaintiffs reassert and reallege paragraphs 1 through 2, and 4 through 70, as if fully set forth in this count.

98.     The PARAMEDICS denied Mr. Beaz needed prehospital treatment and also denied him transport, for an emergency medical condition, in violation of Florida Statute §401.45(1)(a).

99.     Because the PARAMEDICS are employees of the DEPARTMENT, the DEPARTMENT is vicariously liable for their actions and omissions.

WHEREFORE, Plaintiffs demand judgement against all Defendants for compensatory damages, post judgment interest, costs, and such other relief as this Honorable Court may deem equitable and just under the circumstances.

## COUNT IV - NEGLIGENCE CLAIM AGAINST CAPT. WEST, AULT, AND WELDON

100. Plaintiffs reassert and reallege paragraphs 1 through 2, 4 through 20, 26 through 34, 39 through 59, and 63, as if fully set forth in this count.

101. At a minimum, the PARAMEDICS were negligent in their assessment of Mr. Beaz and in their decision not to treat him.

102. Their negligence, including the improper assessment and failure to treat, has been admitted by the DEPARTMENT.

103. The Defendant PARAMEDICS owed Mr. Beaz a duty to provide quality and appropriate medical care in accordance with that level of care and skill which is recognized as acceptable and appropriate by reasonably prudent EMT and EMT-Paramedic professionals in the same or similar community.

104. The Defendant PARAMEDICS owed a duty to follow the policies and procedures of the DEPARTMENT in assessing and treating patients, including Mr. Beaz, that would allow him to receive necessary and appropriate medical care in a prompt and effective manner.

105. The Defendant PARAMEDICS negligently failed to properly evaluate, diagnose, treat, monitor, and manage Mr. Beaz's medical condition, and failed to transport him in accordance with Florida law and the DEPARTMENT's policies.

106. As a direct and proximate foreseeable result of the foregoing, Mr. Beaz suffered severe physical and emotional injuries and mental and physical pain and suffering, in addition to suffering an untimely death on April 2, 2019, and loss of enjoyment of life. PLAINTIFFS, as his surviving children, have also suffered damages which they are entitled to recover, including but not limited to those enumerated under § 768.21,

Florida Statutes, such as: the value of lost support and services from the date of the decedent's injury to her or his death, with interest, and future loss of support and services from the date of death and reduced to present value; lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury; and medical and funeral expenses owed and paid.

WHEREFORE, Plaintiffs demand judgement against CAPT. WEST, AULT, AND WELDON, for compensatory damages, post judgment interest, costs, and such other relief as this Honorable Court may deem equitable and just under the circumstances.

**COUNT V – VICARIOUS LIABILITY CLAIM AGAINST THE DEPARTMENT**

107.   Plaintiffs reassert and reallege paragraphs 1 through 2, 4 through 20, 26 through 34, 39 through 59, 63, and 101 through 106, as if fully set forth in this count.

108.   The DEPARTMENT held itself out as the employer of the Defendant, PARAMEDICS, who were all acting in the course and scope of their employment with the DEPARTMENT during all times relevant to this amended Complaint.

109.   As such, the DEPARTMENT is legally responsible and vicariously liable for the negligence of the PARAMEDICS, as described above, that resulted in the death of Mr. Beaz, and damages to the Plaintiffs.

110.   The DEPARTMENT has admitted that the PARAMEDICS were negligent in their assessment of Mr. Beaz and in their decision not to treat him and transport him.

111.   As a direct and proximate foreseeable result of the foregoing, Mr. Beaz suffered severe physical and emotional injuries and mental and physical pain and suffering, in addition to suffering an untimely death on April 2, 2019, and loss of enjoyment of life. PLAINTIFFS, as his surviving children, have also suffered damages which they

are entitled to recover, including but not limited to those enumerated under § 768.21, Florida Statutes, such as: the value of lost support and services from the date of the decedent's injury to her or his death, with interest, and future loss of support and services from the date of death and reduced to present value; lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury; and medical and funeral expenses owed and paid.

WHEREFORE, Plaintiffs demand judgement against the DEPARTMENT, for compensatory damages, post judgment interest, costs, and such other relief as this Honorable Court may deem equitable and just under the circumstances.

## COUNT VI - NEGLIGENCE CLAIM AGAINST THE DEPARTMENT

112.   Plaintiffs reassert and reallege paragraphs 1 through 2, 4 through 20, 22, 24 through 59, 61 through 70, and 101 through 106, as if fully set forth in this count.

113.   The DEPARTMENT, by and through its staff, employees, agents and/or servants, had a duty to its citizens, and particularly Mr. Beaz, to provide quality and appropriate medical care in a timely manner.

114.   In addition to the DEPARTMENT's vicarious liability for the acts of the PARAMEDICS, the DEPARTMENT is also negligent in its hiring, training, supervision, and retention of employees, including the PARAMEDICS.

115.   The DEPARTMENT also had a duty to have in force and effect policies and procedures regarding training, certification, licensing, and continuing education for and of its employees, agents, and/or servants, including the PARAMEDICS, to ensure they were qualified and trained to render care to citizens, and specifically, Mr. Beaz.

116.   The DEPARTMENT negligently failed to properly train and/or staff its

Rescue trucks, including Rescue 27, and failed to provide competent medical care for the citizens which it served, including Mr. Beaz.

117.   The Defendant PARAMEDICS engaged in and/or showed a propensity to engage in conduct that was in its very nature, dangerous to citizens, including Mr. Beaz.

118.   The DEPARTMENT knew or should have known that these employees were acting, or in all probability would act, in a manner dangerous to the physical health of the citizens, including Mr. Beaz.

119.   The DEPARTMENT had the ability to control these employees such that they could have substantially reduced the probability of harm or death to citizens, including Mr. Beaz. The death of Mr. Beaz could have been reasonably anticipated and prevented by the DEPARTMENT, through the exercise of due diligence and authority over the Co-Defendant PARAMEDICS.

120.   The DEPARTMENT breached its duties to citizens, including Mr. Beaz, by the foregoing reasons, in addition (but not limited) to the following:

a. Failing to follow, or ensure their employees, agents, and/or servants, were following, protocols and/or guidelines for emergency medical care;

b. Failing to implement and/or enforce compliance with policies and procedure promulgated by the DEPARTMENT, the medical director, as well as industry standards;

c. Failing to implement and/or enforce compliance with policies and procedures to ensure that all employees, agents, and/or servants, were trained in how to use life-saving medical equipment and care and treatment; and/or medical equipment in general, as well as to differentiate a cardiac

rhythm versus asystole reading;

d. Failing to implement and/or enforce compliance with policies and procedures to ensure that all employees, agents, and/or servants, are rendering medical care and treatment that meets the acceptable prevailing professional standard of care;

e. Failing to implement and/or enforce compliance with policies and procedures to ensure that all employees, agents, and/or servants did not violate a citizen's Federal and State Constitutional civil rights;

f. Failing to monitor, supervise, and/or ensure that employees, including the PARAMEDICS, are properly reporting information and response times on Patient Care Reports, in addition to following standards on response times and the provision of emergent care;

g. Failing to provide adequate oversight and supervision to ensure that all employees are following applicable guidelines, policies and protocols in rendering proper medical evaluation and care;

h. Failing to properly admonish, discipline and implement adequate remedial and disciplinary actions against its employees, including the PARAMEDICS, who engaged in improper conduct and/or violation of applicable DEPARTMENT policies, procedures, and protocols;

i. Negligently retaining employees who have exhibited a pattern of wrongful conduct or poor decision-making skills; and/or

121. As a direct and proximate foreseeable result of the foregoing, Mr. Beaz suffered severe physical and emotional injuries and mental and physical pain and

suffering, in addition to suffering an untimely death on April 2, 2019, and loss of enjoyment of life. PLAINTIFFS, as his surviving children, have also suffered damages which they are entitled to recover, including but not limited to those enumerated under § 768.21, Florida Statutes, such as: the value of lost support and services from the date of the decedent's injury to her or his death, with interest, and future loss of support and services from the date of death and reduced to present value; lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury; and medical and funeral expenses owed and paid.

WHEREFORE, Plaintiffs demand judgement against the DEPARTMENT, for compensatory damages, post judgment interest, costs, and such other relief as this Honorable Court may deem equitable and just under the circumstances.

## COUNT VII -OUTRAGEOUS CONDUCT CAUSING SEVERE EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

122.    Plaintiffs reassert and reallege paragraphs 1, and 4 through 121, as if fully set forth in this count.

123.    This is a separate action for the outrageous conduct of the Defendants which directly caused severe emotional distress to the Plaintiffs.

124.    The conduct of all of the named Defendants, as specifically alleged herein, was either intentional or reckless, when they knew, or should have known, that severe emotional distress to the Plaintiffs would likely result from their conduct.

125.    The conduct of these Defendants, as described above, was so outrageous that it went beyond all bounds of decency so as to be regarded as utterly intolerable in a civilized community.

126.    The conduct of these Defendants was so reckless and wanting in care that

it constituted a conscious disregard or reckless indifference to Mr. Beaz' life, safety, and rights. The Defendants had actual knowledge of the wrongfulness of the conduct and the high probability that injury or death would result. Nevertheless, the Defendants fostered, pursued, and permitted conduct which ultimately resulted in Mr. Beaz' untimely death.

127.   The conduct of these Defendants, either on an individual or collective basis, caused serious emotional harm and injury to Plaintiffs, DIANA B. CLUFF and JACQUELINE F. BEAZ, who were deprived the companionship, love, and relations with their beloved father.

WHEREFORE, Plaintiffs demand judgement against all Defendants for compensatory damages, post judgment interest, costs, and such other relief as this Honorable Court may deem equitable and just under the circumstances.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand trial by jury on all issues so triable of right by a jury.


Dated:   <u>July 8, 2021</u>

LAW OFFICES OF MAX R. PRICE, P.A.
6701 Sunset Drive #104
Miami, Florida33143
Tel.:  (305) 662-2272
Fax:  (305) 667-3975
Primary:     mprice@pricelegal.com
Secondary: nadia@pricelegal.com


BY: /s/ Max R. Price
MAX R. PRICE, ESQ.
FBN: 651494